IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELIZABETH A. BRUZEWICZ and    )
HOWARD B. PROSSNITZ,          )
                              )
            Plaintiffs,       )
                              )
    v.                        )    No.  07 C 4074
                              )
UNITED STATES OF AMERICA,     )
                              )
            Defendant.        )

<u>MEMORANDUM OPINION AND ORDER</u>

Elizabeth Bruzewicz and her husband Howard Prossnitz
(collectively "Prossnitzes"[1]) have brought this action against
the United States seeking a refund of the taxes, penalties and
interest they previously paid as a result of a notice of
deficiency issued by the Internal Revenue Service ("IRS").  Those
amounts related to a charitable deduction Prossnitzes took on
their income tax returns for the years 2002-04 for the donation
of a preservation facade easement on their home in Oak Park,
Illinois.

Both sides have now invoked Fed. R. Civ. P. ("Rule") 56,
each via a partial motion for summary judgment.  For the reasons
stated here, each motion is granted in part and denied in part.

**Summary Judgment Standards**

Every Rule 56 movant bears the burden of establishing the

_____

    [1]  Though the documents indicate that Mrs. Prossnitz
customarily uses her married name (hence that usage has been
employed in the text), the case caption follows the way in which
the Internal Revenue Service has referred to her.

absence of any genuine issue of material fact (<u>Celotex Corp. v.</u> <u>Catrett</u>, 477 U.S. 317, 322-23 (1986)).  For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)).  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id</u>.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v.</u> <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

One more complexity is added where, as here, cross-motions for summary judgment are involved.  Those same principles require the adoption of a dual perspective that this Court has sometimes referred to as Janus-like:  As to each motion the nonmovant's version of any disputed facts must be credited.  What follows, then, is a summary of the undisputed facts.[2]

---

[2]  LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion identifies Prossnitzes' and the Government's respective submissions as "P." and "G." followed by appropriate designations: LR 56.1 statements as "St. ¶--," responsive statements as "Resp. St. ¶--," exhibits as "Ex.--" and memoranda as "Mem.--," "Resp. Mem.--" and "Reply Mem.--"

**Background**

Prossnitzes own their residence at 203 Forest Avenue in Oak Park, Illinois (P. St. ¶19). Known as the "Orlando Blackmer House," the residence is located in the Frank Lloyd Wright-Prairie School of Architecture Historic District, an area containing 26 structures designed by Frank Lloyd Wright and over 60 additional buildings designed by members of the Prairie School (P. St. ¶20; P. Ex. G).

In November 2002 Mr. Prossnitz spoke to Mary Schmidt ("Schmidt"), the owner of LTV Real Estate Services, Ltd., about retaining her firm to conduct an appraisal of a preservation easement that Prossnitzes were considering donating to the Landmarks Preservation Council of Illinois ("Landmarks Council"). Landmarks Council was started in 1971 to protect and preserve historically significant buildings and has been the recipient of over 500 easement donations, including residential easements in Chicago and surrounding areas (P. St. ¶22-23). Schmidt and her associate Gwen Fiorenzo ("Fiorenzo") spent time gathering research on the preservation easement donation and visited Prossnitzes' home to inspect it for purposes of preparing the appraisal (G. St. ¶3; P. Resp. St. ¶3). Schmidt and Fiorenzo completed the appraisal on November 25, 2002 and sent it to Prossnitzes shortly thereafter (G. St. ¶3).

According to the terms of the easement, Prossnitzes cannot

demolish or remove their home[3] or, without Landmarks Council's prior written approval, (1) change the front or two side facades of the house or (2) make any repairs or reconstruction after a casualty loss (P. St. ¶24).  In addition, they must perform all necessary maintenance on the three facades, and Landmarks Council must be added as an insured under their homeowner's insurance policy (id.).  All mortgages are subordinated to the rights of Landmarks Council to enforce the easement, which runs with the land (id.).  Schmidt and Fiorenzo valued the proposed easement at $216,000 in their appraisal report.

Prossnitzes executed the proposed facade easement on December 3, 2002 and recorded it on December 16 (P. Ex. H).  On their 2002 income tax return they deducted $216,000 as a charitable contribution (G. St. ¶13).  On that year's return they also claimed a $21,600 deduction for a cash payment made to Landmarks Council during 2002 (id.).

As a result of certain deductibility limits, those deductions were spread over the years 2002-04 (id.).  In 2005 the IRS audited Prossnitzes' returns and disallowed the claimed deductions for the $216,000 easement and the $21,600 cash donation (id.).  Next the IRS issued Prossnitzes a statutory

_____

[3]  Prossnitzes were already subject to that restriction under Oak Park's own regulations, which prevent the home from being fully or partially demolished without the Village's permission (P. Ex. C).

4

notice of deficiency that reflected a tax deficiency of $74,521

for the years 2002-04, generating $14,904.20 in penalties (id.).

Prossnitzes paid the taxes and penalties together with interest

and filed a claim for refund of those amounts (G. St. ¶15).

After receiving a small portion of that claim, they then filed

this action seeking a refund of the rest of the taxes, penalties

and interest they had paid as a result of the deficiency notice.

### Tax Code Provisions and Accompanying Regulations

Hintz v. Comm'r, 712 F.2d 281, 284 (7th Cir. 1983) is among

the host of cases confirming this well-known principle:

> As a general matter, a deduction from income for tax
> purposes may be taken only when support for it can be
> found in the language of a statute, appurtenant
> regulations, or legislative history.

For that purpose "it is the taxpayer who bears the burden of

showing that he or she is entitled to a particular deduction"

(id.).

Internal Revenue Code ("Code") §170[4] addresses the allowance

of income tax deductions for charitable contributions and gifts.

As a general rule charitable contributions are permitted "as a

deduction only if verified under regulations prescribed by the

Secretary" (Section 170(a)(1)).  In addition to the requirements

specified by such regulations, Section 170(f)(8)(A) provides:

---

[4]  As always in tax cases, this opinion will hereafter refer
to every Code provision as "Section --," omitting any reference
to Title 26 of the United States Code, where those provisions are
codified.

> No deduction shall be allowed under subsection (a) for
> any contribution of $250 or more unless the taxpayer
> substantiates the contribution by a contemporaneous
> written acknowledgment of the contribution by the donee
> organization that meets the requirements of
> subparagraph (B).

In turn subparagraph (B) states that the acknowledgment must include (1) the amount of cash and a description of any property other than cash contributed, (2) whether the donee organization provided any goods or services in consideration for any such property and (3) if goods or services were provided in exchange, a description and good faith estimate of the value of such goods or services.  And to satisfy the "contemporaneous" requirement, the acknowledgment must be obtained on or before the date on which the taxpayer files a tax return containing the charitable deduction or the deadline date for filing that return (Section 170(f)(8)(C)).

As directed by Congress in the Deficit Reduction Act of 1984, the Treasury Department enacted regulations (cited "Reg. §--") containing specific substantiation requirements applicable to taxpayers taking income tax deductions of charitable contributions of property other than cash.  Reg. §1.170A-13(c)(2)(i) provides:

> [A] donor who claims or reports a deduction with
> respect to a charitable contribution to which this
> paragraph (c) applies must comply with the following
> three requirements:
>
> > (A) Obtain a qualified appraisal (as defined in
> > paragraph (c)(3) of this section) for such

property contributed. If the contributed property
is a partial interest, the appraisal shall be of a
partial interest.

(B) Attach a fully completed appraisal summary (as
defined in paragraph (c)(4) of this section) to
the tax return...on which the deduction for the
contribution is first claimed (or reported) by the
donor.

(C) Maintain records containing the information
required by paragraph (b)(2)(ii) of this section.

And Reg. §170.A-13(c)(3)(ii) prescribes the information required

in a qualified appraisal:

(A) A description of the property in sufficient detail
for a person who is not generally familiar with the
type of property to ascertain that the property that
was appraised is the property that was (or will be)
contributed;

(B) In the case of tangible property, the physical
condition of the property;

(C) The date (or expected date) of contribution to the
donee;

(D) The terms of any agreement or understanding entered
into (or expected to be entered into) by or on behalf
of the donor or donee that relates to the use, sale, or
other disposition of the property contributed,
including, for example, the terms of any agreement or
understanding that –

(1) Restricts temporarily or permanently a donee's
right to use or dispose of the donated property,

(2) Reserves to, or confers upon, anyone (other
than a donee organization or an organization
participating with a donee organization in
cooperative fundraising) any right to the income
from the contributed property or to the possession
of the property, including the right to vote
donated securities, to acquire the property by
purchase or otherwise, or to designate the person
having such income, possession, or right to

acquire, or

> (3) Earmarks donated property for a particular use;

(E) The name, address and (if a taxpayer identification number is otherwise required by section 6109 and the regulations thereunder) the identifying number of the qualified appraiser; and, if the qualified appraiser is acting in his or her capacity as a partner in a partnership, an employee of any person (whether an individual, corporation, or partnerships), or and independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification number (if a number is otherwise required by section 6109 and the regulations thereunder) of the partnership or the person who employs or engages the qualified appraiser;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised:

> (1) The appraised fair market value (within the meaning of §1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

## Substantial Compliance

In its motion the Government contends that the charitable

contribution deduction of $216,000 for the preservation easement was properly disallowed because Prossnitzes failed to comply with several of the substantiation requirements set out in the Code and its accompanying regulations.[5]  Prossnitzes admit that they did not comply with some of the regulations but argue that they are still entitled to the deduction because of their substantial compliance with the regulatory requirements.

Before the extent and effect of any noncompliance on the part of Prossnitzes can be considered, it is first necessary to determine whether the substantial compliance doctrine can be properly applied in this case at all.  Although Prossnitzes maintain that it can, the Government contends the doctrine's application is limited to narrow circumstances not presented here.

As articulated and applied by the Tax Court, the judge-made doctrine of substantial compliance has been used to excuse a taxpayer who has substantially, but not strictly, complied with regulations governing tax elections and deductions (see, e.g., Bond v. Comm'r, 100 T.C. 32, 41 (1993)).  As explained in Taylor v. Comm'r, 67 T.C. 1071, 1077-78 (1977)(citations omitted):

---

[5]  Although the Government had also disallowed the $21,600 cash donation made by Prossnitzes, during the course of the parties' summary judgment briefing it has withdrawn its objection to that deduction (G. Resp. Mem. 1).  Prossnitzes are therefore entitled to a refund of the taxes, penalty and interest assessed on that portion of their claimed deduction.

The critical question to be answered is whether the
requirements relate "to the substance or essence of the
statute."  If so, strict adherence to all statutory and
regulatory requirements is a precondition to an effective
election.  On the other hand, if the requirements are
procedural or directory in that they are not of the essence
of the thing to be done but are given with a view to the
orderly conduct of business, they may be fulfilled by
substantial, if not strict compliance.

When our Court of Appeals had occasion to give en banc

consideration to the substantial compliance doctrine, it observed

that the Tax Court's formulation is confusing and difficult to

apply (Prussner v. United states, 896 F.2d 218, 224 (7th Cir.

1990) refers to the Tax Court's decisions on the subject as

"enough to make one's head swim").  Prussner, id. (citations

omitted) concluded:

We think the doctrine should be interpreted narrowly, and
point out that the courts of appeals owe no special
deference to the Tax Court's legal views; indeed our review
of its legal rulings is plenary.  The common law doctrine of
substantial compliance should not be allowed to spread
beyond cases in which the taxpayer had a good excuse (though
not a legal justification) for failing to comply with either
an unimportant requirement or one unclearly or confusingly
stated in the regulations or the statute.

And so our Court of Appeals has adhered to that tough standard

for applying the doctrine of substantial compliance in such cases

as Tamulis v. Comm'r, 509 F.3d 343, 345-47 (7th Cir. 2007) and

numerous cases cited there.

Prossnitzes insist that those cases are inapposite because

they involved tax code sections and regulations different from

those at issue here and because Bond specifically applied the

10

doctrine of substantial compliance to the requirements in Reg. §1.170A-13. But decisions of the Tax Court are no more binding on this Court than <u>Prussner</u> found them to be on our Court of Appeals. On the contrary, this Court is bound to follow the Court of Appeals' repeated teaching on the doctrine of substantial compliance, which was not limited by its terms to the specific tax provisions involved in those cases.

Hence the view expressed in <u>Prussner</u> will guide the determination of the impact that Prossnitzes' compliance--or noncompliance--with Section 170(f)(8) and Reg. §1.170A-13 has on their charitable contribution deduction. This opinion now turns to that task.

### Contemporaneous Written Acknowledgment

First the Government contends that Prossnitzes have not complied with Section 170(f)(8)(A) because they failed to obtain a contemporaneous written acknowledgment from Landmarks Council stating that it did not provide any goods or services in consideration for the preservation easement donation. In response Prossnitzes offer a January 23, 2003 letter from Landmarks Council's President (P. Ex. O) that, after stating "For your tax records, enclosed is a statement of your contributions to [Landmarks Council]," attaches only a document that says "The following is a list of your contributions from January-December 2002" and that then lists two cash contributions made by

11

Prossnitzes to Landmarks Council (one for $500, the other for $21,600), the respective check numbers of those contributions and, in a column entitled "Type of Donation," the word "Easement" as to each amount.

No other contributions of any kind are adverted to in the letter, and Prossnitzes offer no other written acknowledgment reflecting the donation of a preservation easement as such. Instead they argue that because the letter lists the cash contributions as "easement," it covers both the cash amounts and the asserted preservation easement donated by them.

That argument flouts the express language of Section 170(f)(8)(A) and (B). There is simply no way in which the letter's identification of cash contributions of $500 and $21,600 can be stretched to encompass facade easements (which are property interests, not money) valued at $216,000. Among other deficiencies, there is no description of any claimed easement or its terms in the communication from Landmarks Council.

Plainly neither the January 23, 2003 letter nor its skeletal attachment can serve as the statutorily mandated written acknowledgment of a preservation easement contribution. Lest this be viewed as an inadequate portrayal of the two pages, photocopies are attached to this opinion--note that the January 23 letter is a prototype of the kind of "thank you" confirmation that Section 501(c)(3) organizations send to <u>cash</u> contributors of

at least $250.  With no other writing offered by Prossnitzes in purported satisfaction of Section 170(f)(8)(A), they have flat-out violated its requirements.

Does that level of violations pass the acid test in Prussner, 896 F.2d at 224?  Is the requirement of a written acknowledgment "either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute," so that the Prossnitzes' purported compliance can even be considered "substantial," let alone strict?  Simply to state that question compels a "no" answer.

First, the statute is neither unclear nor confusing about the need for a written acknowledgment.  It explicitly defines the situations in which a contemporaneous written acknowledgment is required (for any contribution of $250 or more), and it spells out chapter and verse as to what must be included in the acknowledgment and as to when the acknowledgment must be received (Section 170(f)(8)(A)-(C)).

Nor can it be said that the statutory requirement is "unimportant."  To begin with, its very inclusion in the Code provision itself, rather than in accompanying regulations promulgated by the Treasury Department, signals a negative answer to that inquiry.  And that result is underscored by the nature of the statutorily stated consequence:  "No deduction shall be allowed...unless the taxpayer substantiates the contribution" by

the specified contemporaneous written acknowledgment by the donee organization. Lacking that, the IRS is faced with the absence of even a prima facie showing of the existence of a substantial charitable contribution. Even though our tax system is basically one of self-reporting, the statutory establishment of a watershed--$250--beyond which validation is required in addition to a taxpayer's self-declaration cannot be said to be unimportant.

Prossnitzes' total failure to comply with the just-discussed statutory requirement is alone fatal to their claimed deduction of the preservation facade easement. But because they have also fallen well short of satisfying various other substantiation requirements on which any such easement deduction is conditioned, this opinion turns to a consideration of those instances of noncompliance as well. That analysis reveals that all in all, Prossnitzes' added deficiencies also confirm their failure to meet even a generous application of the amorphous doctrine of substantial compliance.

**Qualifications of the Appraisers**

Prossnitzes admit at P. Mem. 25 that the appraisal they obtained in connection with the preservation easement does not set out the qualifications of either Schmidt or Fiorenzo as required by Reg. §170.A-13(c)(3)(ii)(F). Instead they contend that the appraisal contains the real estate appraiser license

numbers of Schmidt and Fiorenzo, assertedly amounting to substantial compliance with the regulations (id. at 5-6, 25).

Again the operative question for determining whether strict or substantial compliance with the regulation is required is whether its requirements are unimportant or confusing so as to excuse a taxpayer's noncompliance. In that respect, not only is the regulatorily mandated inclusion of the qualifications of an appraiser in the appraisal report straightforward, but the regulation also specifies the qualifying information to be included: the appraiser's background, experience, education and membership in professional appraisal associations (Reg. §1.170A-13(c)(3)(ii)(F)).[6] There can be no doubt about what is required, at a minimum, to comply with that provision, and the tendered appraisal did not include any of that information.

Prossnitzes' contention that the license numbers of Schmidt and Fiorenzo suffice to establish that they were experienced and qualified appraisers misses the mark. If an appraiser's license number alone were adequate evidence of his or her qualifications, the Treasury Department's regulations would not specify, in

_____

[6] During this Court's nearly three decades in the practice of law, including extensive work in the fields of major commercial and residential real estate development, it represented leading appraisers in those fields--including those affiliated with a client that was then Chicago's preemininent real estate management, brokerage and appraisal firm. None of those appraisers would ever generate a formal appraisal without including such a curriculum vitae.

addition to the license numbers (required by Reg. §1.70A-B(c)(3)(ii)(E)), the need for qualitative information about the appraiser's background (separately specified in Reg. §1.170A-13(c)(3)(ii)F)). That qualitative requirement is hardly surprising, for it provides the IRS with some basis on which to determine whether the valuation in an appraisal report is competent and credible evidence to support what in some cases may be a very large tax saving. And a statement of an appraiser's background and experience is particularly significant when the subject of the appraisal is as esoteric and specialized as the valuation of a real estate easement. For that reason as well, the regulatory requirements cannot be viewed as unimportant.

**Description of the Donated Property**

Reg. §1.170A-13(c)(3)(ii)(A) requires a qualified appraisal to contain "[a] description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed." On that score the Government urges that the appraisal obtained by Prossnitzes lacks that information, because it attaches only a draft preservation easement that does not specify which parts of their home are subject to the easement. Prossnitzes respond that because the easement creates duties and restrictions as to the entire residence, general information about the home was adequate to

16

meet the regulatory requirements.

There is no doubt that the appraisal obtained by Prossnitzes contains a description of their residence in great detail. Information about their home, both its interior and exterior, is provided through text, photographs and sketches (P. Ex. A; G. Ex. 3). What is missing from the appraisal, however, is a description of those parts of the house that are subject to the facade easement.

There is a statement in the appraisal cover letter at the beginning of P. Ex. A that "[t]he Facade Easement is further described in the agreement entitled Preservation Easement and is to be granted to Landmark's Preservation Council of Illinois...." But that purported "agreement," attached to the appraisal as a Supplemental Addendum, is no more than a printed form of a draft document that is both incomplete and unsigned. Although the form document recites the terms of an easement, including the construction and maintenance restrictions on what are termed "Protected Elements," it contains no Exhibit B (where the "Protected Elements" are supposed to be described). Thus the reader of the appraisal has no way to determine how much or how little of Prossnitzes' home has been donated to Landmarks Council and is subject to the limitations imposed by the easement.

To be sure, the actual executed easement document filed with the Cook County Recorder's office about a week after the

appraisal date did have attached an Exhibit B containing a brief listing of the "Protected Elements" (P. Ex. H; G. Ex. 4). Just why that vital component of the claimed easement was not included in the week-earlier appraisal is not for this Court to speculate. But that is just one more way in which the substantiation requirements for obtaining a tax deduction of the easement have not been met.

Those substantiation requirements are important, indeed essential, to the review of charitable contribution deductions and the reliability of corresponding appraisals. Absent a description of the facade easement, the appraisal and its valuation of the donated property are meaningless. There is no way for the IRS or any outside party to judge whether the appraisal is reasonable or to understand the basis for the valuation of such undefined contributed property. Neither is the requirement in any way confusing. There is really no excuse for Prossnitzes' failure to comply strictly with its terms.

That said, however, if that were the only flaw in the Prossnitzes' claim this Court would be loath to disqualify the claimed deduction on that basis alone. Here the proximity in time between the appraisal date and the recording of the actual easement document would, in this Court's view, qualify that

defect for substantial compliance treatment.[7]

**Other Requirements**

In addition to what has gone before, the Government also contends that the appraisal summary that Prossnitzes were required to submit was deficient because it did not contain the signatures of both Schmidt and Fiorenzo and did not include the cost basis of the property affected by the easement. It also urges that the appraisal submitted by Prossnitzes did not contain a proper basis for the valuation of the easement or use the correct definition of market value.

Resolution of the parties' cross-motions in the Government's favor (except for the item discussed in n.5) has already taken place in this opinion without the need to determine whether and to what effect any such further deficiencies exist. It has heretofore been shown conclusively that Prossnitzes failed utterly to comply with two important substantiation requirements for their claimed preservation easement deduction, requiring the denial of that deduction. But because the parties have dedicated such a large part of their filings to the question of easement valuation, that subject will be addressed--albeit less extensively--here.

In that regard the Government's objection to the valuation

_____

[7] As discussed in the next section, that view connotes no expression of opinion as to the adequacy of the appraisal in substantive terms.

methodology employed in the Schmidt-Fiorenzo appraisal is
qualitative rather than quantitative. In contrast to many of the
cases discussed by Prossnitzes, here the Government has not
challenged the valuation of the easement by suggesting that
another amount is more appropriate, so as to trigger a sort of
"battle of appraisals." Instead the government urges that the
appraisal fails to comply with the Reg. §1.170A-13(c)(3)(ii)(K)
requirement that it contain "[t]he specific basis for the
valuation, such as specific comparable sales transactions or
statistical sampling, including a justification for using
sampling and an explanation of the sampling procedure employed."
According to the Government, although the appraisal purports to
use the before and after method[8] to determine the value of the
easement, it really applies an arbitrary percentage to the
established "before" value of the property to arrive at the
asserted "after" value, rather than independently determining the
real "after" value.

True enough, the Government's arguments as to the
appraisal's formulaic application of a percentage reduction cast
a good deal of doubt on the ultimate reliability and credibility

---

[8]   Under the before and after method, the value of an
easement is determined "by subtracting the value of the property
immediately after the imposition of the easement from the value
of the property immediately before the imposition of the easement
to estimate the value of the easement" (Hilborn v. Comm'r, 85
T.C. 677, 689 (1985)).

of its valuation determination (more on this subject a bit later). But in this Court's view, substantial added evidentiary input would be needed to resolve the question whether the appraisal does or does not meet the requirements of Reg. §1.170A-13(c)(3)(ii)(K). Schmidt's and Fiorenzo's appraisal sets out a number of qualitative factors that, according to them, flowed from the imposition of the easement restrictions and resulted in a decline in value of the Prossnitzes' property. Although the appraisers did not use comparable sales transactions to arrive at an "after" value for the property, the use of the "such as" qualifier in Reg. §1.170A-13(c)(3)(ii)(K) does not make the use of comparables the exclusive approach to valuation.

As Schmidt testified (P. Ex. L at 91) and as other courts have noted (see, e.g., Nicoladis v. Comm'r, T.C. Mem. 1988-163 (1988)), comparable sales transactions involving real estate with similar facade easements are not always available. In a number of cases percentage reductions have been accepted to determine an easement's value based on qualitative factors that suggest such a value (see, e.g., id.; Griffin v. Comm'r, T.C. Mem. 1989-130 (1989); Losch v. Comm'r, T.C. Mem. 1988-230 (1988)).

Because the appraisal report here did contain a statement of claimed reasons for some loss of value, this Court will not hold as a matter of law that it departed entirely from the approach taken in those cases. But it must be said that the appraisal's

superficial impressiveness in size, which emulates conventional

real estate appraisals in many respects, does not fully mask its

obviously problematic treatment.  It echoes all such conventional

appraisals by reciting the customary threefold approach to real

estate valuation:  replacement cost, income capitalization and

sales comparison--but then it really applies those only to assert

the then present market value of the Prossnitzes' home, and <u>not</u>

to evaluate the easement that the appraisers purport to be

valuing.  On that score--the expected effect of the easement on

the then-current value of the residence--the vaunted 43-page bulk

of the appraisal reduces to a few short paragraphs on the fourth

of its five pages of text:

> 1.  The loss of the right to develop the property
> up to the maximum density of zoning laws.
>
> 2.  Maintenance and insurance requirements may be
> in excess of properties not eased.
>
> 3.  Legal exposure if the easement is breached.
>
> 4.  Loss in value due to the fact that subsequent
> owners would lose the right to receive possible tax
> benefits from the conveyance of such an easement
> results in a loss of value between 10% and 20% of
> overall value.  In the case of the subject, due to
> unique qualities of the improvements, the loss of
> potential assemblage value as well as other considera-
> tions, we estimate the donation of the easement,
> results in a loss of value of 18%.

Only the last of those purports to quantify the appraisers'

bootstrapping approach that they say enabled them to reach a

$984,000 "after" value from the $1.2 million "before" value.  In

this Court's view that approach would most likely face real difficulty if this case had to reach trial. But this opinion will not look to or rely on any such doubts as a basis for the conclusion reached here, for even if the substance of the valuation were to be regarded as valid, that would not preserve[9] Prossnitzes' deduction from the consequence of their unquestioned failure to comply with the statutory and regulatory requirements discussed earlier.[10]

One last comment is in order. Prossnitzes argue in their memorandum that by disallowing their deduction for the preservation easement, the Government is trying to do indirectly what others have been unable to do directly. According to P.

---

[9]  Bad pun intended.

[10]  This Court is, however, constrained to observe that the appraisers' adoption of an arbitrarily determined percentage approach, particularly when extended by them to multiplying that percentage by the number of building facades involved, appears to call for careful scrutiny by someone who recognizes when an emperor has no clothes. Or to put matters a bit differently, there appears to be a substantial question whether Landmarks Council can fairly represent, while taking into account the Prossnitzes' $21,600 cash contribution, that "no goods or services have been provided in consideration of these gifts" (P. Ex. O). Is the fact that the amount of that contribution was exactly 10% of the appraisers' valuation of the easement supposed to be a coincidence? Whatever Landmarks Council's interest in historic preservation as such may be (and this Court does not question the validity--or the societal value--of that interest at all), this situation looks much like one in which the Landmarks Council might be thought of as providing not goods but services--its honoring of a friendly appraisal--in consideration of the cash contribution. But any such skepticism has played no part in this Court's decision, which it has earlier sought to explain with great care and in appropriate detail in the text.

Mem. 4, easement critics have unsuccessfully tried to persuade Congress to repeal the statute authorizing preservation easement deductions, so the Government is seeking to invalidate such deductions through an inappropriately restrictive reading of the Code and its regulations. But it should be made clear that the result in this case--the disallowance of Prossnitzes' preservation easement deduction--might have been avoided (or at a minimum the debate could have been shifted to the question of evaluation of any claimed deduction) had Prossnitzes simply complied with the clear requirements set forth in the governing statutes and regulations. It just cannot be said that any improper motive on the Government's part is in any way responsible for today's outcome.

**Assessed Penalty**

As a final matter, P. Mem. 16-17 argues that the penalty of $14,904.20 should not have been assessed by the IRS. In support of that claim Prossnitzes seek to rely on <u>Heasley v Comm'r</u>, 902 F.2d 380, 383 (5th Cir. 1990):

> Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.

Although the Government acknowledges that disallowance of the easement deduction does not by itself trigger the assessment of a

penalty for a valuation overstatement, it contends that Section 6662 provides for the assessment of a penalty against Prossnitzes on either of two other grounds:  (1) negligence or disregard of the rules or regulations and (2) a substantial understatement of income tax (G. Ex. 10).

Prossnitzes did not elect to offer any reply to that dual response.  But as for the first ground, the Government acknowledges that factual issues may exist as to whether the penalty is appropriate on the basis of Prossnitzes' negligence. Although Prossnitzes have not identified any such issues by way of a reply, this Court would be reluctant to reject their claim because of their silence.

But that does not apply to the Government's second ground, as to which it maintains that disallowance of the easement deduction (the subject on which this opinion has already ruled) renders a penalty for Prossnitzes' consequent substantial understatement of their income tax liability appropriate as a matter of law.  That creates a somewhat unusual situation: Although the Government has not made the penalty a subject of its own motion for summary judgment, it nevertheless has identified a ground on which, as a matter of law, it is entitled to retain the penalty assessment.  With nothing from Prossnitzes offered to counter that contention, the penalty must stand.

## **Conclusion**

There are no genuine issues of material (that is, outcome-determinative) fact. This Court accordingly:

1.  grants the Government's motion to disallow the $216,000 preservation easement deduction sought by Prossnitzes,

2.  grants Prossnitzes' cross-motion to validate their $21,600 cash donation and orders the Government to refund the portion of the taxes and penalty attributable to that $21,600 cash payment and

3.  denies Prossnitzes' motion to disallow the remaining tax deficiency and the remainder of the $14,904.20 penalty assessed against them.

This is a final order.

_____
Milton I. Shadur
Senior United States District Judge

Date:  March 25, 2009